CASTNER, CURRAN & BULLITT, Inc., v. LEDERER, Internal Revenue Collector.

(District Court, E. D. Pennsylvania. August 18, 1921.)

No. 7428.

1. **Internal revenue ⏀7—Computation of "invested capital" of corporation for purpose of excess profits tax.**

The invested capital of a corporation formed by the combination of two business concerns for the purpose of excess profits tax under Act Feb. 24, 1919, § 326 (Comp. St. Ann. Supp. 1919, § 6336$^{7}$/₁₆i), *held* to be the value of the property as agreed upon by the parties at the time of the combination and for which stock was issued to each party.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Invest—Investment.]

2. **Words and phrases—"Actual cash value;" "value in actual cash."**

"Actual cash value" and "value in actual cash" and other like expressions convey the thought of the sum which can be obtained at a fair sale—i. e., the market value.

[Ed. Note.—For other definitions, see Words and Phrases; Second Series, Actual Cash Value.]

At Law. Action by Castner, Curran & Bullitt, Incorporated, against Ephraim Lederer, Collector of Internal Revenue. On trial hearing without a jury. Findings made.

Thomas Raeburn White, of Philadelphia, Pa., for plaintiff.
Charles D. McAvoy, U. S. Atty., of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. Every chain of thought leading to a conclusion has a beginning. We begin with one, to be followed to the conclusion to which it leads, by assuming the purpose of Congress to tax corporations. The next link in the chain is that this tax is to be measured and graded, not by the net income of the corporation, but by the relation of this income to the "invested capital" which contributed to its production. A statutory definition of "invested capital" thus became necessary. In order to find terms by which to define it, there was further need to have clearly in mind the nature of the corporations to be taxed and the modes of their organization. The corporation must have a capital invested in the business in which it was engaged. It was usual in corporations having much capital to measure it in terms of money. In this way was expressed the thought of how much the capital might lawfully be and also how much it in fact was. The interest of the contributing members in this was expressed in shares. In this way we came to have the expressions "authorized capital" and "capital paid in." Contributions thus made to the capital of the corporation might be made in lawful money and these moneys invested by the corporation in property for which the corporation had use or contributions might be made in property. All laws providing for the formations and regulation of corporations permit such contributions of property at least in part. The acknowledgment of contributions to capital took the form usually of certificates issued to contributors expressed in shares of the total contributions and also in terms of money. The possessions of many corporations, the right to share in which was evidenced by these certificates, came to be such that the money terms used in the certificates lost their old and took on a new meaning. Because of this there came into use terms and phrases expressive of the distinction between what was real and what was fictitious capital.

The lawmaker was willing to accept the first as an element in the computation of the tax. He wanted also to exclude the latter. When contributions to capital had taken the form of what is commonly called "cash," the sum so contributed was "included in invested capital." The next subject with which he dealt was that of contributions in some form of property other than "cash." Here was a difficulty. He sought to cope with it by distinguishing between "tangible" and "intangible" property. Doubtless the introducer of these words would himself admit that they do not express very definitely the thought meant to be conveyed. Any one, however, who went upon a hunt for a better expression would have a long search. The difficulty is inherent in the subject. No one gets very far in the science of politico-economics (especially that part of it which deals with what is called "value" and "money") before he is impressed with the vagueness and indefiniteness of many of the ideas of which he is expected to form a concept and with the poverty of our language, in its supply of words and phrases, to express with exactness the thought meant to be conveyed. Accepting for the moment this classification of property, we are directed to include "tangible" property in "invested capital." "Intangible" property (of which good will, trade-marks, etc., are given us as illustrations), acquired by the corporation by purchase, we are further directed to

include at the purchase price. Such property, if contributed as capital in consideration of shares in what the corporation owns, is to be included at a valuation not exceeding its value "in actual cash" at the time contributed nor exceeding the nominal value of the stock issued therefor and subject to the further limitation that not more than one-fifth of the total capital stock shall be so issued. This, with the addition of accretions or so-called "surplus," whether contributed or earned, is all which is permitted to be "included in invested capital." The application of this law to the facts of this case can be best made after a statement of the facts. We may premise that no question arises concerning a "cash" stock contribution of $300,000, nor are we concerned with any "intangible" property acquired by purchase (of which there was none), nor with the value of the "intangible" property for which shares of stock issued, because this value is admitted to exceed $300,000, the limitation prescribed by the act of Congress (Act Feb. 24, 1919, § 326 [Comp. St. Ann. Supp. 1919, § 6336⁷/₁₆i]). The only questions with which we are concerned are: (1) How much of the property which was contributed was, in the language of the statute, "tangible"? and (2) What was then its value?

## The Facts.

A statement of the facts in this case may be made one of great complexity or very broad, short, and simple. We prefer the latter at the possible cost of making it so general as to be in all respects not strictly accurate. For present purposes, however, it is a true statement. The plaintiff is a Delaware corporation with a total issued capital stock of $1,500,000, of which $300,000 is first preferred stock issued for "cash." The corporation is the result of a combination of two business ventures and two property interests. One we will call the "Castner" and the other the "Hyams" interest.

## The Castner.

This began originally as a partnership back in the early '50's. It had a very successful business career, and without further following its history was incorporated under the laws of New Jersey by the same name as the present plaintiff. It was engaged in selling coal both on its own account and for others on commission. The commission business was on a del credere commission basis. It had contracts with a number of mines in the Pocohontas and New River coal fields whose total outputs it sold. All its customers were its own. It directed the points to which shipments were made, including points at tidewater for shipment abroad. The business it did was profitable as well as otherwise successful.

## The Hyams Interest.

Godfrey M. Hyams came later into the coal business. He concerned himself with it because of his connection with and interest in the Virginia Railway, known to railroad and high finance fame as the "Rogers Road." His original motive was to divert or at least bring a large coal trade to that road. Large and powerful financial

interests were enlisted in his aid. Assistance was rendered through the Tidewater Company, a construction and financing corporation, which had been organized to build the Virginia Railroad. Hyams secured control of a corporation engaged in the coal business in Boston, Mass. He also acquired wharfing and coal-handling facilities in Boston and Providence, and built up a marine equipment, including steamers on the Great Lakes, and prepared for the construction of cargo ships. His wharf and terminal facilities he held under an agreement of lease with an option of purchase. His fleet consisted largely ·of contracts with shipbuilders. The preparations he had made to do business were ample for any trade, but he found he could command none. The control both of the coal and the customers was in other hands, as were also the facilities for distribution. This discovery drove him to seek a combination with the Castner people, who, among other advantages, had known coal depots scattered all along the sea-going trade routes.

### The Combination.

A combination thus offered advantages to both parties and was made. A first step toward it was to reach a relatively fair valuation of the interests to be combined. This was accomplished by putting a like value upon each. The combination took the form of a new corporation. It was organized, as already stated, under the laws of Delaware. The capital of the new corporation consisted of all which belonged to the two former ventures with $300,000 of fresh cash capital contributed by Hyams. For this there was issued to him shares of first preferred stock of a nominal value in that sum. Shares of the nominal value of $600,000 were issued to each interest in consideration ·of the making over to the new corporation of what was represented in the business of both the old ventures. This gave the corporation a nominal capital of $1,500,000. It was given the name of the old Castner Corporation. This was doubtless to save the good will of the old business.

### Some Observations.

It will be recalled that the act of Congress imposes no limitations upon "invested capital" in the form of contributions of "tangible" property. The limitations are restricted to "intangible" property. It will likewise be observed that the capital of the plaintiff corporation is made up of "cash" and "property" contributions, without any division indicated of the latter into "tangible" and "intangible." It is to be further observed that, if the two contributions were of like value, for the purpose of ownership it made no difference (as the first preferred stock did not share beyond what was paid for it) what nominal value was placed upon what was contributed. Each owned half of the whole, whatever its value. The whole was accordingly valued at $1,200,000, and, calling the capital stock $1,200,000, the property which the stock had come to represent constituted the "invested capital." The name given to it, whether the name was expressed in terms of money or otherwise, was merely a name. When, however, the "invested capital" came to be expressed in terms of money for taxing purposes, the name

became all-important. Its practical importance is shown by a contrast of the findings we are asked to make. The plaintiff asks us to find the total value of the "invested capital" (exclusive of "intangible" property in excess of $300,000) to be $4,151,138.20. The defendant asks for a finding of the value of the same property of $725,509.10.

### The Law of the Case.

In the view we have taken of "the real question involved" in the instant case no question of law arises. The whole question is one of fact, to wit, the value of the property for which the $1,200,000 of stock was issued. There is no need to construe the act of Congress (further than already done), and none to determine what is "tangible" and what "intangible" property so far as these are questions of law.

### Findings of Facts.

We have passed upon the requests for findings of facts presented by the parties respectively. There is, however, but one finding to be made, and it is hereby made as follows:

The value of all the effects and property of the plaintiff (inclusive of the $300,000 of so-called "cash") was at the time affecting this tax levy $1,500,000, and so far as it is a question of fact the "invested capital" of the plaintiff is found for taxing purposes to have been that sum.

### Conclusion of Law.

So far as the above conclusion is one of law, it is so found as such.

### Discussion.

[1, 2] The considerations which have led us to the conclusion stated may be briefly summarized. The act of Congress, it is true, does not limit the valuation of "tangible" property acquired by an issue of stock to the nominal value of the stock so issued, as it does in the case of "intangible" property. None the less, one who contributes property to the capital of a corporation makes a declaration of its fair value. It is the common or joint declaration of the contributor and the corporation. As such, it is, as against the declarants, evidence at least equally as convincing as other declarations of opinion made or procured subsequently when the interests of the parties have shifted. Moreover, the kind of property to which these latter opinions relate and the kind of values which the opinions contemplate are of the most elusive, illusory, kaleidoscopic, and chameleon-hued character. "Actual cash value," "value in actual cash," and other like expressions convey the thought of the sum which can be obtained for them at a fair sale. This means market value. None of the witnesses who testified to the values given had any such test in mind. The best market value test of the value of the assets of a corporation is afforded by the price at which its stock sells. This although the best practical test, is a poor one, because it is affected perhaps least of all by the value of what the corporation has viewed merely as property. This in the case of a going concern would ordinarily be a small percentage of its value as part of a profitable enterprise. No better illustration of the kind of results to which such

275 F.—15

opinions lead can be afforded than by the summary given us of this opinion value of a number of contracts for ship constructions and of wharf construction, including even contracts on the cost plus basis. The aggregate (after deducting the contract prices) is $3,425,569.10. The opinion increment of value of the items reaches as high as one and one-third times the original contract price. How are such figures reached? The process is simple enough. The valuation is made as of the date of July 6, 1916. The witness takes the highest price per ton which he had heard of paid for a real ship in esse "about" that date (otherwise a price paid when prices were at their very highest). He in consequence assumes that the ship, if constructed, would then have such a value per ton, and by deducting the contract price from the valuation thus given he gets the value of the contract. We do not mean to state that this is the line of thought avowed, but that it is the one followed no one who heard these witnesses could doubt. One of the most philosophical of lawyers has stated that "the administration of the law witnesses the struggle of the judiciary to gratify their desire to be logically consistent and at the same time to show some common sense." The common sense motive behind this provision of the act of Congress is to have some check on the inflation to which the capital of many corporations has been subjected so that for taxing purposes at least overstated capital may be deflated. "Tangible" property, having an "actual cash value," must surely have something more of substance about it than anything suggested by these valuations. There is another check upon these valuations given us, which we mention with some diffidence, because no point has been made of it, and neither plaintiff nor defendant has had an opportunity to answer it. We may in consequence be wholly wrong about it. We see that it may be a "point no point," inasmuch as, although a valuation of tangible property aggregating over $300,000 is put forward, we have no valuation of the "intangible property" beyond the statement and admission that its value exceeds $300,000. There must, notwithstanding, be something in the point unless the total valuation of both tangible and intangible property reaches figures almost fabulous. The point is this: Exclusive of "intangible" property and the $300,000 cash stock, the valuation now placed on the property is $3,851,138.20. This is the same property which (including the $300,000 of intangible property and all the additional value it may have had) the parties themselves valued at $1,200,-000. By the agreement of July 6, 1916, the Castner Corporation sold all it had to the plaintiff corporation in consideration of $300,000 of second preferred and $300,000 of common stock, or $600,000 in all. By this very paper the value of all "the tangible assets" is placed at the net sum of $360,000. Its "intangible assets" were thus valued at $240,-000. The proportions make the total valuation look about as such valuations go. Certainly none too low. Now comes the point. We are told now, what was then agreed to be the fact, that the Castner and Hyams property had a like value. The Castner property, we know upon the very best of evidence, had, so far as it was tangible, a net value of $360,000. How, then, could any one be persuaded that the Hyams

tangible property, put in at the same valuation, could have a value over ten times as great? There is every reason to believe that the Castner good will and other intangible assets was all there was. This is confirmed by the summary, which claims nothing for the intangibles other than what came from Castner. The only answer possible is to value the Castner good will at about $2,750,000. We find the evidence which forces such a result unconvincing. The fact conclusions reached are as follows:

(1) The value of the tangible property of the plaintiff on July 6, 1916, other than the cash contributions to its capital was $900,000.

(2) The value of its intangible property was $300,000.

(3) The value of its tangible property in cash represented by stock contributions was $300,000.

(4) The total invested capital of the plaintiff on the basis of which the rate of net income is property to be determined was $1,500,000.

We have found the valuation of the whole property of the corporation in July, 1916, or its "invested capital" to have been (exclusive of the $300,000 cash contribution) $1,200,000. Of this $300,000 was the value of the "intangibles," leaving $900,000 for the "tangibles." This is more than twice the value the defendant concedes, which is $423,-569.10. The latter valuation, however, allows nothing for the Hyams interest, assuming (as plaintiff in its summary does) that the "intangibles" came from Castner. Plaintiff values the Hyams "tangibles" at $3,425,569.10; the defendant at nothing. We have valued them at $600,000, or $450,000 in net results effect. We have reached this result by refusing to accept or be convinced of the correctness of plaintiff's valuation. The artificiality of this summary of values is shown by the figures. The valuation is made up of a number of items. Some of them are of vessels in esse or in posse valued on a per ton dead weight basis. The total, however, is $425,569.10 in excess of $3,000,-000. These are the exact figures of the Castner cash assets item of $425,569.10. It would have been much simpler had the valuers stated that they had raised the cost price contractual values an even $3,000,-000. This is what they did, whether aware of it or not. The striking of these exact figures was not arithmetical coincidence. What we have done is to reduce this $3,000,000 boost to $600,000, or, in another way of looking at it, to what in results effect is $450,000. In doing this we have been liberal to the plaintiff. We have reached the valuation made influenced largely by the thought that it does not lie in the mouth of defendant to say that Hyams contributed nothing of value to the combination or even no "tangible" property of value beyond the $300,000 cash contribution to stock. The defendant admits that the "Castner" interests contributed $360,000, net value) in "tangible" property and $300,000 in "intangible." The Castner people admitted the Hyams contribution to be equal in value to their own. This was a self-denying declaration of practical evidential value. The finding is justified that the contributions were of equal value. Defendant has conceded a valuation to the Castner contribution of $60,000 more than the owners at the time claimed for it. How can it with good grace be claimed that that

for which the Castners in effect made an even trade had no value? We find its value to have been $600,000, and the Castner contribution to have had a like value. The parties so valued both contributions before they were as much interested as now to over value. They were even then under the temptation to make the valuation high. The real value of each contribution did not, it may be, exceed $360,000. They could, however, be trusted to make the relative valuation a sound one. The valuation reached was $600,000 for each. The defendant cannot be heard to complain of this valuation now, because he admits the Castner contribution to have been worth $660,000. The horse sense of accepting the $1,200,000 valuation made by the parties at the time, we think, commends itself. Indeed, following the defendant's admission of the Castner values, the total valuation might be made $1,320,000, or, including the $300,000 cash contribution, $1,620,000. The justification for the finding of a valuation of $1,200,000, or $1,500,000 in all, is found in the legal evidence, in that there is opinion evidence that the total value is $4,451,138.20. The finding of a less value has in consequence evidential support. This finding indicates the judgment which should follow it. We do not have at hand the data from which the judgment to be entered on this basis can be figured. As a consequence we do not now enter judgment, but retain jurisdiction of the cause for this purpose, and counsel for either party may move for the proper judgment with costs.